# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| VoiceAge EVS LLC, a Delaware limited liability company,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>OnePlus Technology (Shenzhen) Co., Ltd.,<br><br>　　　　　　　　Defendant. | Case No. _____<br><br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR PATENT INFRINGEMENT

VoiceAge EVS LLC ("VoiceAge EVS" or "Plaintiff") brings this action for patent infringement under 35 U.S.C. § 271 against OnePlus Technology (Shenzhen) Co., Ltd. ("OnePlus" or "Defendant").

## INTRODUCTION

1.    This action involves foundational patented audio coding technology developed by VoiceAge Corporation. The six patents at issue—part of a larger portfolio covering the Enhanced Voice Services ("EVS") standard—are directed to technologies that provide, among other benefits, improved sound quality, clearer calls and smoother conferencing in wireless and fixed wireline applications.

2.    Since acquiring the EVS standard patent portfolio from VoiceAge Corporation in December 2018, VoiceAge EVS LLC has successfully executed eleven licenses to some of the largest handset manufacturers in the world. Many of these licenses were executed without any litigation. When necessary, however, VoiceAge EVS has protected its intellectual property rights in courts and administrative bodies in the United States, Germany, Brazil, China, and the United

Kingdom. Cumulatively, decisions from these courts and administrative bodies have upheld the validity of VoiceAge EVS's patents, found that accused devices complying with the EVS standard infringed VoiceAge EVS's patents, and have further found that VoiceAge EVS's licensing activities and offered per unit rates were fair, reasonable, and non-discriminatory.

3.      As a result, VoiceAge EVS LLC has successfully licensed its EVS patent portfolio to the wireless services industry including the majority of the United States and European handset markets. Thus, while the industry has widely recognized the value of VoiceAge EVS's intellectual property, OnePlus remains one of the few wireless device manufacturers that has yet to take a license.

*       *       *

4.      By way of background, VoiceAge Corporation and VoiceAge EVS LLC are independent companies. VoiceAge Corporation is the world's premier supplier of speech and audio codecs—*i.e.*, technology for encoding and decoding audio information. Since its creation in 1999 by professors and scientists at the Université de Sherbrooke, VoiceAge Corporation has been at the center of pioneering speech and audio technology.

5.      Through its work, VoiceAge Corporation developed world-leading technology for wideband, super wideband, and fullband low bit rate speech and audio compression technologies. VoiceAge Corporation provided the core technologies for at least nine internationally standardized voice and audio codecs for both wireless and wired applications. All standardization organizations to which VoiceAge has proposed its patented technology over the past two decades have preferred VoiceAge technologies over other technologies. These include the 3rd Generation Partnership Project ("3GPP"), 3GPP2, the International Telecommunications Union ("ITU"), the European Telecommunications Standards Institute ("ETSI") and the Motion Picture Experts Group ("MPEG") of the International Organization for Standardization ("ISO").

6.      One technology that VoiceAge Corporation developed, alongside others, is the Enhanced Voice Services codec. VoiceAge Corporation was a key contributor to the

development of the EVS codec and its adoption by 3GPP as the next generation speech and audio codec standard for wireless communications.

7.      The EVS codec was designed for the Fourth Generation mobile communications standard (otherwise known as the "4G" or Long-Term Evolution—"LTE" standard). In particular, the EVS codec was designed for use with Voice over LTE ("VoLTE") services. The patents at issue in this matter are generally drawn to the EVS codec.

8.      The EVS codec employs cutting-edge technology to significantly enhance the communication quality, efficiency, and versatility of 3GPP mobile communication systems. The EVS codec is rapidly replacing the Adaptive Multirate Wideband ("AMR-WB") codec (also based on VoiceAge Corporation's work) as the leading standard for speech and audio coding on wireless networks. Among the many benefits over AMR-WB, EVS provides full-HD voice audio quality, higher efficiency and versatility, and increased reliability to consumers.

9.      The delivery of unprecedented quality for speech, background music (when appropriate), and mixed content through the EVS codec is the result of a number of technical advantages and improvements over AMR-WB. For example, where AMR-WB was limited to wideband, the EVS codec allows audio signals to be encoded in narrowband ("NB"), wideband ("WB"), super wideband ("SWB"), or fullband ("FB"). The EVS codec also: allows the use of variable bit rates across a wide range of bit rates from 5.6 kb/s to 128 kb/s, allowing service providers to optimize network capacity and call quality as desired for their service; improves compression efficiency at all operational rates; provides the capability to switch bit rates at every 20-ms frame, allowing the codec to easily adapt to changes in channel capacity; incorporates unique concealment techniques to minimize the impact of packet loss caused by adverse conditions in the transmission channel; includes a system for Jitter Buffer Management ("JBM"); and uses different coding strategies depending on the characteristics of the signals to be transmitted.

10.     Compared to AMR-WB, EVS more than doubles the spectral bandwidth available to encode sound signals, resulting in unprecedented quality voice transmission and the transfer of high-quality non-vocal audio such as music:



11.     Independent studies have shown that EVS outperforms AMR-WB at all operational points, providing much higher quality sound using fewer bits than AMR-WB.

12.     Through these and other technical advantages, EVS (sometimes referred to commercially as "Enhanced HD Voice," "Ultra HD Voice," or "HD Voice+") provides a high efficiency and versatile solution to audio and speech encoding. Consumers therefore enjoy, for example: better sounding, clearer calls; smoother conferencing; and a "being-there" quality of experience.

13.     In 2016, T-Mobile became the first wireless carrier in the United States to upgrade its network to support EVS, touting EVS as "a true next-gen voice technology that delivers some incredibly cool benefits to our customers," including "improv[ing] voice call reliability in areas of weaker signal" and "even higher-fidelity calls."[1] On information and belief,

---

[1] Neville Ray, *Patent-Pending: T-Mobile's Next Network Upgrade with Enhanced Voice Services*, T-MOBILE (last accessed May 1, 2025), https://www.t-mobile.com/news/volte-

Verizon Wireless also upgraded its network to support EVS.[2] The 3GPP "anticipate[s] that enhanced voice services based on the new EVS codec will become the dominant voice service in 3GPP LTE networks."[3]

14.    Through its research and development efforts, VoiceAge Corporation was awarded a number of patents directed to the EVS codec. These patent assets, including all patents asserted in this Complaint, were assigned and/or exclusively licensed to VoiceAge EVS.

15.    As further evidence of the value of VoiceAge Corporation's inventions, numerous mobile device and communications companies have taken licenses to these patents, including all patents asserted in this Complaint, both before and after the assignment of patent rights from VoiceAge Corporation to VoiceAge EVS.

## NATURE OF THE ACTION

16.    VoiceAge EVS licenses a global, standard-essential patent portfolio relating to voice and audio technologies for both mobile wireless and fixed wireline applications essential to the EVS industry standard. The VoiceAge EVS portfolio is comprised of more than 520 issued patents and fifteen pending patent applications across fifteen standard-essential patent families worldwide.

17.    This Complaint alleges patent infringement. VoiceAge EVS alleges that OnePlus has infringed, and continues to infringe, directly and/or indirectly, six VoiceAge EVS patents: U.S. Patent Nos. 7,693,710 (the "'710 patent"), 8,401,843 (the "'843 patent"), 8,990,073 (the "'073 patent"), 8,825,475, (the "'475 patent"), 9,852,741 (the "'741 patent"), and 9,015,038 (the "'038 patent"), copies of which are attached as Exhibits 1-6 (collectively, the "VoiceAge Patents").

---

enhanced-voice-services; attached as Exhibit 38.

[2] *See, e.g.*, Sascha Segan, *How to Make Your Cell Phone Calls Sound Better*, PCMAG (last accessed May 1, 2025), https://www.pcmag.com/article/360357/how-to-make-your-cell-phone-calls-sound-better; attached as Exhibit 39.

[3] 3GPP TR 26.952 V16.1.0 (2019-06).

18.    The '710 patent, entitled "Method and device for efficient frame erasure concealment in linear predictive based speech codecs," issued on April 6, 2010 and names Milan Jelinek and Philippe Gournay as inventors.

19.    The '843 patent, entitled "Method and device for coding transition frames in speech signals," issued on March 19, 2013 and names Vaclav Eksler, Milan Jelinek, and Redwan Salami as inventors.

20.    The '073 patent, entitled "Method and device for sound activity detection and sound signal classification," issued on March 24, 2015 and names Vladimir Malenovsky, Milan Jelinek, Tommy Vaillancourt, and Redwan Salami as inventors.

21.    The '475 patent, entitled "Transform-domain codebook in a CELP coder and decoder," issued on September 2, 2014 and names Vaclav Eksler as the inventor.

22.    The '741 patent, entitled "Methods, encoder and decoder for linear predictive encoding and decoding of sound signals upon transition between frames having different sampling rates," issued on December 26, 2017 and names Redwan Salami and Vaclav Eksler as inventors.

23.    The '038 patent, entitled "Coding generic audio signals at low bitrates and low delay," issued on April 21, 2015 and names Tommy Vaillancourt and Milan Jelinek as inventors.

24.    The VoiceAge Patents cover foundational audio coding technologies for the EVS codec. These technologies are necessary for OnePlus's consumers to enjoy Enhanced HD Voice, Ultra HD Voice, or HD Voice+ services when using OnePlus's mobile devices. The VoiceAge Patents disclose technologies that enable many consumer benefits including better sounding, clearer calls and smoother conferencing, when compared to older technologies operating at the same bit rate.

25.    OnePlus directly infringes the VoiceAge Patents by making, using, offering to sell, selling, and/or importing into the United States mobile devices that practice the inventions claimed in the VoiceAge Patents.

26.    OnePlus indirectly infringes the VoiceAge Patents by inducing its consumer end-users to directly infringe the VoiceAge Patents. OnePlus induces infringement by providing mobile devices that, when used by consumers for voice calls or conferencing using EVS technology, as directed and intended by OnePlus, cause those users to make, use, and practice the inventions claimed in the VoiceAge Patents.

27.    OnePlus indirectly infringes the VoiceAge Patents by inducing third party resellers to directly infringe the VoiceAge Patents. OnePlus induces infringement by shipping, for importation by third party resellers, mobile devices that practice the inventions claimed in the VoiceAge Patents.

28.    VoiceAge EVS seeks damages and other relief for OnePlus's infringement of the VoiceAge Patents.

## THE PARTIES

29.    VoiceAge EVS is a Delaware limited liability company. Its principal place of business is 620 Newport Center Drive, Suite 1100, Newport Beach, CA 92660. VoiceAge EVS owns patents covering foundational voice coding technologies, including those asserted here.

30.    Defendant OnePlus Technology Shenzhen is a corporation organized and existing under the laws of China with a principal place of business at 18F Tairan Building, Block C, Tairan 8th Road, Chegongmiao, Futian District, Shenzhen, Guangdong 518040, China. OnePlus Technology Shenzhen designs, manufactures, and markets mobile communication and media devices. OnePlus Technology Shenzhen makes, uses, sells, offers for sale, markets, distributes, supplies and/or imports throughout the United States, including this District, products, such as mobile devices, that infringe the VoiceAge Patents.

31.    OnePlus is the head of an interrelated group of companies which together comprise one of the leading makers and sellers of smartphones and related devices. OnePlus's

privacy policy, for example, refers to OnePlus Technology (Shenzhen) Co., Ltd. and its affiliates as "we, us or OnePlus."[4]

32.    OnePlus and its affiliates share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused product lines and products involving related technologies. Thus, OnePlus and its affiliates operate as a unitary business and are jointly and severally liable for the acts of patent infringement alleged herein.

## JURISDICTION AND VENUE

33.    This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

34.    This Court has both general and specific jurisdiction over OnePlus because, directly or through intermediaries, OnePlus has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over OnePlus, pursuant to the Texas Long Arm Statute, would not offend traditional notions of fair play and substantial justice. OnePlus, directly and through subsidiaries and intermediaries (including distributors, retailers, franchisees and others), has committed, and continues to commit acts of patent infringement in this District, by, among other things, making, using, testing, selling, licensing, importing and/or offering for sale/license products and services that infringe the VoiceAge Patents.

35.    For example, OnePlus offers accused products for sale in the United States and this District via its website. *See* https://www.oneplus.com/us/store/phone (last accessed Apr. 30, 2025), attached as Exhibit 41. In addition, the OnePlus website, https://www.oneplus.com/us (last accessed Apr. 30, 2025), attached as Exhibit 42, includes a Use of Cookies user agreement between users and "OnePlus Technology (Shenzhen) Co., Ltd (referred to as we, us or OnePlus)" at https://www.oneplus.com/us/legal/use-of-cookies (last accessed Apr. 30, 2025), attached as

---

[4] OnePlus, Privacy Policy (last accessed Apr. 30, 2025), available at: https://www.oneplus.com/global/legal/privacy-policy; attached as Exhibit 40.

Exhibit 43. OnePlus further runs a "Trade-in Program," "Referral Program," and "Affiliate Program" through its website to market and sell the accused products in the United States and this District. *See* https://www.oneplus.com/us/trade-in (last accessed Apr. 30, 2025); attached as Exhibit 44; https://www.oneplus.com/us/oneplus-open/referral (last accessed Apr. 30, 2025); attached as Exhibit 45; https://www.oneplus.com/us/affiliate-program (last accessed Apr. 30, 2025); attached as Exhibit 46.

36.     OnePlus advertises that its accused products are available for sale in the United States and this District through T-Mobile. *See* https://www.oneplus.com/us/tmo-deals (last accessed Apr. 30, 2025); attached as Exhibit 47.

37.     On information and belief, OnePlus products accused in this Complaint are, and have been, offered for sale and sold in physical BestBuy retail stores located within the State of Texas and the Eastern District of Texas, for example at 5514 S Broadway Ave, Tyler, TX 75703; and 422 W Loop 281, Ste 100, Longview, TX 75605.

38.     OnePlus has previously admitted to transacting business in Texas and consented to jurisdiction in this District. *See Altpass LLC v. OnePlus Technology (Shenzhen) Co., Ltd.*, No. 2-20-cv-00105, Dkt. 21 at 1-2 (E.D. Tex. Oct. 21, 2020) ("OnePlus admits it transacts business within the State of Texas…" and "OnePlus . . . does not contest that the Eastern District of Texas has personal jurisdiction over OnePlus in this action").

39.     Alternatively, the Court has personal jurisdiction over OnePlus under Federal Rule of Civil Procedure 4(k)(2). This case arises under federal law, OnePlus is not subject to general jurisdiction of any one state, and the exercise of jurisdiction is consistent with the United States Constitution.

40.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) and 1400(b).

41.     OnePlus is a foreign corporation that may be sued in any judicial district in the United States, including this District. *See* 28 U.S.C. §§ 1391(b) and 1391(c)(3). OnePlus regularly conducts business in this District and has committed, and continues to commit, acts of direct and indirect patent infringement in this District.

## TECHNOLOGY BACKGROUND

42.    The technology at issue in this case relates to the field of audio and speech codecs used in mobile telecommunications, including, but not limited to, LTE user devices.

43.    Since the advent of the telephone, delivering high quality audio over constrained bandwidth channels has been a challenge. Generally speaking, delivery requires balancing two competing demands: bandwidth utilization and audio quality.

44.    Bandwidth utilization can be measured by the number of bits per second that are transmitted—the "bit rate." The less bandwidth assigned to a given telephone call, the more simultaneous calls a mobile phone system can support. This is because mobile phone carriers are assigned only a finite portion of the radio frequency spectrum. Thus, bandwidth utilization is improved when the bit rate is lower.

45.    Audio quality can be measured, for example, by the subjective response of listeners to a call. One example of a way to assess users' opinion of call quality is a Mean Opinion Score, or "MOS." For a given bit rate, the performance of codecs may be evaluated by an MOS. Higher MOS values reflect subjectively better audio quality.

46.    Audio quality can be improved if a larger part of the audio spectrum is transmitted. The portion of the audio spectrum transmitted can be measured in hertz or "Hz." In so-called "narrowband" use, audio frequencies in the range 20-4000 Hz are theoretically used, though the actual bandwidth used is typically 300-3400 Hz for audio. In wideband use, audio frequencies theoretically range from 20-8000 Hz; in super wideband use, audio frequencies theoretically range from 20-16000 Hz; and, in fullband, audio frequencies theoretically range from 20-20000 Hz. Transmitting wider band audio frequencies (which includes super wideband and fullband), however, generally requires using an increased bit rate.

47.    To deliver greater audio quality using less bandwidth, audio signals at a transmitting handset are generally passed through an "encoder," a codec that converts analog audio signals into processed digital signals. At the receiving handset, a "decoder" reverses the

process, converting the received digital signals into analog signals suitable for the receiving handset's speaker.

48.    Modern speech codecs rely on two primary forms of coding: waveform-based speech coding and parametric-based speech coding.

49.    Waveform-based speech coding focuses heavily on analyzing the shape of a sound wave (including speech signals and non-speech signals), removing redundant and unnecessary components of the audio signals, and transferring the modified wave to a decoder. In practice, this technique produces reasonably good sound quality but is comparatively ineffective at low bit-rate audio signal processing.

50.    Parametric-based speech coding attempts to model the characteristics of the human vocal tract within very short bursts of time (*e.g.*, 20 ms frames) of a sound wave. This information, which is essentially a description of the speaker's vocal tract and its temporal evolution, is then transferred to a decoder that reconstructs the vocal pattern and performs speech synthesis to generate audio signals that resemble the original input. Parametric-based speech coding is very effective at low bit-rate transmission because it eliminates much of the data associated with the waveform, but often results in computerized and mechanical vocal reproduction.

51.    One hybrid approach to these two coding types is called the Algebraic code-excited linear prediction ("ACELP") technique—an improvement on the code-excited linear prediction ("CELP") technique. The ACELP technique combines waveform and parametric-based speech coding techniques with linear prediction of sound waves using past frames and the use of a codebook. Codebooks store indexed sound patterns at both the encoder and decoder, allowing the transfer of only the indices to those sound patterns instead of complete sound patterns.

52.    Broadly speaking, encoders use codebooks in the following way, which is sometimes called "analysis by synthesis." *See* '710 patent at 6:39-43. The encoder stores the sample of audio to be encoded. It then generates ("synthesizes") audio using various entries in

the codebook and compares ("analyzes") each of these synthesized sounds with the audio to be encoded. The entries in the codebook are called codevectors. The analysis is completed when the encoder finds a codevector that best, or most closely, synthesizes a sound that matches the stored audio.

53.    The ACELP model was pioneered by VoiceAge Corporation and is utilized by the AMR-WB speech codec—the required codec for the Global System for Mobile Communications ("GSM") and Wide Band Code Division Multiple Access ("WCDMA") (i.e., 3rd Generation cellular networks). The AMR-WB speech codec, however, had several limitations, including being limited to narrowband and wideband implementations.

54.    In 2014, the global telecommunications standards body, 3GPP, adopted a successor to the AMR-WB codec known as the Enhanced Voice Services, or EVS codec. The EVS codec addressed some of the limitations of the prior AMR-WB codec. The EVS codec was developed by the collaboration between several leading companies in the industry, including manufacturers (chipset, handset, infrastructure), operators, and technology providers. As part of this process, the EVS codec was standardized. Standardization followed the rigorous 3GPP process, which included setting aggressive requirements and design constraints, with qualification, selection, and characterization phases comprising extensive subjective testing performed by world-renowned independent test labs. VoiceAge Corporation was a recognized leading contributor to the EVS codec as developed and then embodied in the 3GPP standard.

55.    The EVS codec is embodied in 3GPP standards documents known as technical specifications ("TS"). The 26 series of technical specifications cover various aspects of the EVS codec, including at least 26.441, 26.442, 26.443, 26.444, 26.445, 26.446, 26.447, 26.448, 26.449, 26.450, 26.451, 26.114 and 26.952 (collectively the "EVS Standard").

### NOTICE AND COMPLIANCE WITH FRAND OBLIGATIONS

56.    The asserted VoiceAge Patents are essential to the EVS Standard.

57.    Further, the EVS codec, as defined by the EVS Standard, is mandatory for all mobile devices supporting Voice over New Radio ("VoNR") technology. *See* 5G Americas, The

Future of Voice in Mobile Wireless Communications (Feb. 2021) at 11 (§ 2.3). Fifth Generation ("5G") cellular technology supports calling and video conferencing using VoNR. *See* GSM Association Non-confidential Official Document NG.114 - IMS Profile for Voice, Video and Messaging over 5GS (§ 3.2.2.3); GSM Association Non-confidential Official Document IR.92 – IMS Profile for Voice and SMS (May 2021) (§ 2.4.3.3).

58.     All of the asserted VoiceAge Patents have been declared essential to the EVS Standard by way of Intellectual Property Rights ("IPR") Declarations to one or more of 3GPP's organizational partners.

59.     On information and belief, OnePlus is an active participant in 3GPP at least by participation through 3GPP organizational partners such as the China Communications Standards Association (CCSA).

60.     In addition, OnePlus has significantly invested in rolling out 5G cellular technology (necessarily supporting the EVS codec) in its products. For example, on March 10, 2020, a press release quoted Mr. Pete Lau, CEO of OnePlus, as stating "going forward, we're all in on 5G." Mr. Lau further stated: "I want to restate our commitment to 5G and our long term investment. We've been investing in 5G for several years and we see this as the direction going forward and one we're very much committed to." *See* https://www.cnet.com/tech/mobile/oneplus-8-will-be-all-in-on-5g-says-ceo/ (last accessed Apr. 30, 2025); attached as Exhibit 48.

61.     OnePlus issued another press release on March 12, 2020 stating "Global smartphone brand OnePlus is investing almost USD 30 million to scale up and upgrade 5G research and development labs, showcasing its commitment to bringing 5G technology to more users worldwide. Having started 5G research as early as 2016, OnePlus plans to extend its plans to push 5G research and development forward, allowing OnePlus users to enjoy fast and smooth experiences on 5G. '5G is a top priority in our product strategy,' said Pete Lau, Founder and CEO of OnePlus, 'We have been investing in 5G for years and we plan to further develop application scenarios based on the daily usage habits of users, such as cloud gaming, cloud

videos, and cloud storage services.'" *See* https://www.prnewswire.com/news-releases/oneplus-announces-investment-in-5g-research-and-development-labs-301021940.html (last accessed Apr. 30, 2025); attached as Exhibit 49.

62.    Through its participation in 3GPP and significant investments in 5G, OnePlus has, or should have, knowledge of the asserted VoiceAge Patents and the fact that the asserted VoiceAge Patents have been declared essential to the EVS Standard.

### The VoiceAge EVS Website and IPEC Declarations

63.    VoiceAge EVS maintains a publicly available website at the URL https://www.voiceageevs.com (last accessed Apr. 30, 2025), attached as Exhibit 50.

64.    The content of the VoiceAge EVS website as it relates to the facts described below has remained substantially unchanged since going live on or around July 26, 2019.

65.    The VoiceAge EVS website states that patents from fourteen families within VoiceAge EVS's portfolio, including the specific asserted VoiceAge Patents, were independently evaluated by the International Patent Evaluation Consortium ("IPEC").

66.    IPEC is a recognized independent evaluator of patent essentiality. IPEC represents itself as staffed by professional patent attorneys experienced in patent essentiality determinations for a broad range of internationally standardized technologies, including cellular communications technologies and audio/video codec technologies.

67.    The VoiceAge EVS website also states that IPEC determined that patents from fourteen families within VoiceAge EVS's portfolio, including the specific asserted VoiceAge Patents in this case, are essential to the EVS Standard.

*See* VoiceAge EVS IPEC Reports, http://www.voiceageevs.com/ipec.aspx (last accessed Apr. 29, 2025), attached as Exhibit 22.

68.     IPEC Declarations of Essentiality are publicly available on the VoiceAge EVS website:



*See* VoiceAge EVS IPEC Reports, http://www.voiceageevs.com/ipec.aspx (last accessed Apr. 29, 2025), attached as Exhibit 22.

69.     Each IPEC Declaration identifies two claims of the VoiceAge Patent found to be essential to the EVS Standard, the particular sections of the EVS Standard relevant to the identified VoiceAge Patent claims, and products relevant to the identified VoiceAge Patent claims (*e.g.*, terminal products and/or base station products).

70.     For example, the IPEC Declaration for the asserted '710 patent identifies claims 4 and 16 as essential for mobile devices to comply with the EVS Standard Sections 4.1, 4.3, 4.4, 4.4.2, 5.5, 5.5.1, 5.5.2, and 5.5.3:

<div style="border:1px solid black; padding:10px;">

The above mentioned Evaluators hereby declare that the following claim(s):

- Claim 4
- Claim 16

in the above referenced patent, is(are) essential to making, using in, selling within, or importing into, the countries of registration, any 3GPP product (the applicable Product Categories are given below) that is or purports to be in compliance with the following parts of the Third Generation Partnership Program (3GPP) technical standards:

- Document 3GPP TS 26.445 V12.0.0 (2014-09): Sections 4.1, 4.3, 4.4, 4.4.2, 5.5, 5.5.1, 5.5.2, and 5.5.3

Claim 4 is relevant for 3GPP Terminal Products and 3GPP Base Station Products.
Claim 16 is relevant for 3GPP Terminal Products and 3GPP Base Station Products.

</div>

(*See* Exhibit 23.)

71.     On or around July 26, 2019, IPEC Declarations for each of the asserted VoiceAge Patents were first made available through the VoiceAge EVS website. The IPEC Declarations for each of the asserted VoiceAge Patents are attached as Exhibits 23-28.

72.     The VoiceAge EVS website also states that "full IPEC evaluations/reports [are] available upon request[.]" *See* VoiceAge EVS IPEC Reports, http://www.voiceageevs.com/ipec.aspx (last accessed Apr. 29, 2025), attached as Exhibit 22.

73.     The VoiceAge EVS website also includes detailed information regarding a prospective license, including a complete running royalty license template, a complete lump sum license template, and specific royalty rate information.

74.     VoiceAge EVS's licensing activities have been reviewed approvingly by numerous courts. For example, in a redacted published opinion, the district court of Mannheim, Germany found that VoiceAge EVS's license offers for its EVS standard patent portfolio to a prospective licensee were fair, reasonable, and non-discriminatory. The Mannheim court further

found that VoiceAge EVS's offered royalty rate was neither exploitive nor discriminatory and that VoiceAge EVS's per unit rate was not unreasonably high.

**<u>VoiceAge EVS's Communications with OnePlus</u>**

75.    OnePlus is familiar with VoiceAge Corporation and its development of cutting edge speech and audio codecs for, among other applications, mobile device communications.

76.    In a letter dated February 3, 2020, from VoiceAge EVS CEO David Rosmann addressed to the General Counsel of OnePlus, VoiceAge EVS invited OnePlus to learn more about the VoiceAge EVS patent portfolio developed by VoiceAge Corporation and to license VoiceAge EVS's patents essential to the EVS standard. The letter stated that an independent patent evaluation consortium had reviewed the VoiceAge EVS patent portfolio and declared patents in all fourteen patent families essential to the EVS standard. The letter also noted that, upon execution of a mutual non-disclosure agreement ("NDA"), VoiceAge EVS could provide OnePlus with a standard-essential license, licensing rate tables, and additional detailed materials regarding the VoiceAge EVS patent portfolio. The letter directed OnePlus to the VoiceAge EVS website, www.voiceageevs.com, for further information. *See* Exhibit 29.

77.    On February 11, 2020, VoiceAge EVS received corresponding proof of delivery of this letter. *See* Exhibit 30.

78.    VoiceAge EVS received no response from OnePlus to the February 3, 2020 letter.

79.    On March 27, 2020 and December 7, 2020, VoiceAge EVS attempted to follow-up with OnePlus by letter, but receipt of the letters was refused or otherwise unsuccessful.

80.    Between December 2019 and December 2020, VoiceAge EVS also sent similar letters to OnePlus affiliates Realme Chongqing Mobile Telecommunications Corp., Ltd. ("Realme"), Guangdong OPPO Mobile Telecommunications Co., Ltd. ("OPPO"), and Guangdong Oujia Holdings Co., Ltd. but received no substantive response.

81.    In the time since VoiceAge EVS first reached out to OnePlus, VoiceAge EVS has entered into NDAs, conducted multiple rounds of negotiations, and concluded patent licenses with eleven other sophisticated handset manufacturers. In comparison to VoiceAge EVS's

discussions with other handset manufacturers, VoiceAge EVS reasonably concluded that OnePlus was unwilling to engage in good faith negotiations.

## THE VOICEAGE PATENTS

82.    All right, title, and interest in each of the VoiceAge Patents were assigned by their respective inventors to VoiceAge Corporation. Each of the assignments from the inventors to VoiceAge Corporation were duly recorded with the United States Patent Office ("USPTO"). These are attached to the Complaint as Exhibits 7-12.

83.    On December 5, 2018, VoiceAge Corporation assigned all right, title, and interest in the VoiceAge Patents to VoiceAge EVS. This assignment included all causes of action for past, current, and future infringement, as well as all causes of action and other enforcement rights for damages, injunctive relief, and any other remedies of any kind. The assignment further included all rights to collect royalties and other payments under, or on account of, the VoiceAge Patents. The assignment from VoiceAge Corporation to VoiceAge EVS was duly recorded with the USPTO and is attached to the Complaint as Exhibit 13.

84.    VoiceAge EVS solely owns all rights, titles, and interests in and to the VoiceAge Patents, each described below.

## I.    The '710 Patent

85.    The '710 patent, entitled "Method and device for efficient frame erasure concealment in linear predictive based speech codecs," was duly and legally issued on April 6, 2010, from a patent application filed May 30, 2003, with Milan Jelinek and Philippe Gournay as named inventors. The '710 patent claims priority to Canadian Application No. 2388439, filed on May 31, 2002.

86.    The inventions disclosed in the '710 patent cover, for example, techniques for improving synthesized speech quality in digital speech communication systems, especially when operating in wireless environments and packet-switched networks. *See, e.g.*, '710 patent, 11:18-36. The inventions provide techniques for the digital "encoding and decoding of sound signals to maintain good performance in case of erased frame(s) due, for example, to channel errors in

wireless systems or lost packets in voice over packet network applications." *See, e.g.*, *id.*, 1:18-25.

87.    In wireless cellular environments and packet-switched networks, high bit error rates or a long delay can result in erased frames. *See, e.g.*, *id.*, 11:21-36. "In these systems, the codec is subjected to typically 3 to 5% frame erasure rates." *See, e.g., id.* "The erasure of frames has a major effect on the synthesized speech quality in digital speech communication systems, especially when operating in wireless environments and packet-switched networks." *See, e.g.*, *id.*, 11:18-21.

88.    The '710 patent explains that "[t]he problem of frame erasure (FER) processing is basically twofold. First, when an erased frame indicator arrives, the missing frame must be generated by using the information sent in the previous frame and by estimating the signal evolution in the missing frame. The success of the estimation depends not only on the concealment strategy, but also on the place in the speech signal where the erasure happens. Second, a smooth transition must be assured when normal operation recovers, *i.e.* when the first good frame arrives after a block of erased frames (one or more). This is not a trivial task as the true synthesis and the estimated synthesis can evolve differently. When the first good frame arrives, the decoder is hence desynchronized from the encoder. The main reason is that low bit rate encoders rely on pitch prediction, and, during erased frames, the memory of the pitch predictor is no longer the same as the one at the encoder. The problem is amplified when many consecutive frames are erased. As for the concealment, the difficulty of the normal processing recovery depends on the type of speech signal where the erasure occurred." *See, e.g.*, *id.*, 11:38-57.

89.    The '710 patent discloses particular solutions to the technical problem of FER processing by "improving concealment of frame erasure caused by frames of an encoded sound signal erased during transmission from an encoder to a decoder, and for accelerating recovery of the decoder after non erased frames of the encoded sound signal have been received[.]" *See, e.g.*, *id.*, 2:58-63.

90.    The '710 patent, for example, discloses use of concealment/recovery parameters determined in the encoder and transmitted to the decoder. *See, e.g., id.*, 2:58-3:48.

91.    According to one embodiment, these concealment/recovery parameters include classification of each frame according to the type of speech signal, information about the signal energy, and phase information. *See, e.g., id.*, 11:58-12:5, 12:65-13:2, 13:13-32, 21:2-37, 22:37-39, 31:40-44, 35:63-67.

92.    Classifying each frame at the encoder according to the type of speech signal permits taking into account the future signal behavior, and has the advantage of working with the original signal instead of the synthesized signal, if desired. *See, e.g., id.*, 13:38-50. The decoder handles frame erasure and recovery in response to the received concealment/recovery parameters. *See, e.g., id.*, 3:25-28, 31:47-49, 35:60-36:17. In this way, the negative effect of frame erasures can be mitigated by adapting concealment and recovery from frame erasure to the type of the speech signal where the erasure occurs. *See, e.g., id.*, 11:58-12:5.

93.    According to the USPTO examiner, the claims of the '710 patent issued because, among other reasons, "the prior art of record does not disclose or reasonably suggest the limitations of classifying successive frames as unvoiced, unvoiced transition, voiced transition, voiced, or onset, and calculating an energy information parameter in relation to a maximum of a signal energy for frames classified as voiced or onset, and calculating the energy information parameter in relation to average energy per samples for other frames, in combination with determining and transmitting concealment recovery parameters and conducting frame erasure concealment." '710 File History, Notice of Allowance, December 18, 2009, at 3; *see also id.* at 2-4.[5]

## II.    The '843 Patent

94.    The '843 patent, entitled "Method and device for coding transition frames in speech signals," was duly and legally issued on March 19, 2013, from a patent application filed

---

[5] Cited excerpts of the '710 file history are attached as Exhibit 14.

October 24, 2007, with Vaclav Eksler, Milan Jelinek, and Redwan Salami as named inventors. The '843 patent claims priority to U.S. Provisional Application No. 60/853,749, filed on October 24, 2006.

95.    The inventions disclosed in the '843 patent cover techniques "for digitally encoding a sound signal, for example a speech or audio signal, in view of transmitting and synthesizing this sound signal." *See, e.g.*, '843 patent, 1:6-9. For example, the patent discloses techniques "for encoding transition frames in a predictive speech and/or audio encoder in order to improve the encoder robustness against lost frames and/or improve the coding efficiency." *See, e.g.*, *id.*, 2:51-55.

96.    The '843 patent explains that "CELP-type speech codecs rely heavily on prediction to achieve their high performance. The prediction used can be of different kinds but usually comprises the use of an adaptive codebook containing an excitation signal selected in past frames. A CELP encoder exploits the quasi periodicity of voiced speech signal by searching in the past excitation the segment most similar to the segment being currently encoded. The same past excitation signal is maintained also in the decoder." *See, e.g.*, *id.*, 1:63-2:4.

97.    The '843 patent explains that "[a] problem of strong prediction inherent in CELP-based speech coders appears in presence of transmission errors (erased frames or packets) when the state of the encoder and the decoder become desynchronized. Due to the prediction, the effect of an erased frame is thus not limited to the erased frame, but continues to propagate after the erasure, often during several following frames. Naturally, the perceptual impact can be very annoying." *See, e.g.*, *id.*, 2:10-17.

98.    The '843 patent discloses particular solutions to solving this and other technical problems. One embodiment disclosed in the '843 patent includes a "transition mode (TM) encoding technique[.]" *See, e.g.*, *id.*, 5:59-64. The TM encoding technique refers to collecting transition frames and frames following the transition in a sound signal, for example a speech or audio signal. "The TM coding technique replaces the adaptive codebook of the CELP codec by a new codebook of glottal impulse shapes, hereinafter designated as glottal-shape codebook, in

transition frames and in frames following the transition. The glottal-shape codebook is a fixed codebook independent of the past excitation. Consequently, once a frame erasure is over, the encoder and the decoder use the same excitation whereby convergence to clean-channel synthesis is quite rapid." *See, e.g.*, *id.*, 5:59-6:5.

99.    The '843 inventions can, for example, "eliminate error propagation and increase coding efficiency in CELP-based codecs by replacing the inter-frame dependent adaptive codebook search by a non-predictive, for example glottal-shape, codebook search. This technique requires no extra delay, negligible additional complexity, and no increase in bit rate compared to traditional CELP encoding." *See, e.g.*, *id.*, 2:56-62.

100.    According to the USPTO examiner, the claims of the '843 patent issued because, among other reasons, the prior art at issue "d[id] not fairly teach or suggest a transition mode codebook for generating a set of codevectors independent from past excitation, the transition mode codebook being responsive to the codebook index for generating, in the transition frame and/or the at least one frame following the transition, one of the codevectors of the set corresponding to said transition mode excitation; wherein the transition mode codebook comprises a codebook of glottal impulse shapes." '843 File History, Notice of Allowance, December 21, 2012, at 2.[6]

## III.    The '073 Patent

101.    The '073 patent, entitled "Method and device for sound activity detection and sound signal classification," was duly and legally issued on March 24, 2015, from a patent application filed June 20, 2008, with Vladimir Malenovsky, Milan Jelinek, Tommy Vaillancourt, and Redwan Salami as named inventors. The '073 patent claims priority to U.S. Provisional Application No. 60/929,336, filed on June 22, 2007.

102.    The inventions disclosed in the '073 patent relate to the technical problem of "sound activity detection, background noise estimation and sound signal classification where

---

[6] Cited excerpts of the '843 file history are attached as Exhibit 15.

sound is understood as a useful signal." '073 patent, 1:7-9. In one aspect, the techniques claimed by the '073 patent include a "Sound Activity Detection (SAD) algorithm where sound could be speech or music or any useful signal." *See, e.g.*, *id.*, 2:48-50. The "tonal stability detection [is] used to improve the performance of the SAD algorithm in case of music signals." *See, e.g.*, *id.*, 2:50-53.

103.    In one embodiment of the '073 patent, the techniques for estimating tonal stability include "calculating a current residual spectrum of the sound signal; detecting peaks in the current residual spectrum; calculating a correlation map between the current residual spectrum and a previous residual spectrum for each detected peak; and calculating a long-term correlation map based on the calculated correlation map, the long-term correlation map being indicative of a tonal stability in the sound signal." *See, e.g.*, *id.*, Abstract. "Tonal stability estimation is used to improve the performance of sound activity detection in the presence of music signals, and to better discriminate between unvoiced sounds and music." *See, e.g.*, *id.*, 1:26-29. In this way, "[f]or example, the tonal stability estimation may be used in a super-wideband codec to decide the codec model to encode the signal above 7 kHz." *See, e.g.*, *id.*, 1:29-32, 16:56-58.

104.    The '073 patent thus claims particular solutions to solving the technical problem of "sound activity detection, background noise estimation and sound signal classification where sound is understood as a useful signal" (*id.*, 1:7-9) and other technical problems using, for example, particular techniques for "estimating a tonal stability of a sound signal" and "us[ing tonal stability estimation] to improve the performance of sound activity detection in the presence of music signals, and to better discriminate between unvoiced sounds and music." *See, e.g.*, *id.*, Abstract, 1:26-29.

105.    According to the USPTO examiner, the claims of the '073 patent issued because, among other reasons, "[t]he closest relevant prior art . . ., either taken individually or in combination, fails to explicitly teach or reasonably suggest the invention as represented by

method claim 1." '073 File History, Notice of Allowance, November 6, 2014, at 3.[7] The patent examiner recognized that the claimed inventions "provided a novel way of estimating the tonal stability of a sound signal, thus taken as a whole this claim represents a new inventive concept." *Id.* For example, the examiner found that the prior art did "not teach identifying the tonal stability of the sound signal based on calculating a long-term correlation map, wherein the long-term correlation map is calculated based on an update factor, the correlation map of a current frame, and an initial value of the long term correlation map." *Id.* at 3-7.

**IV.    The '475 Patent**

106.    The '475 patent, entitled "Transform-domain codebook in a CELP coder and decoder," was duly and legally issued on September 2, 2014, from a patent application filed May 11, 2012, with Vaclav Eksler as the named inventor. The '475 patent claims priority to U.S. Provisional Application No. 61/484,968, filed on May 11, 2011.

107.    The inventions disclosed in the '475 patent allow techniques for improving the quality of encoded speech at higher bitrates. *See, e.g.*, '475 patent, 1:60-2:2.

108.    The ACELP model, as explained by the '475 patent, "[a]lthough very efficient to encode speech at low bit rates, [] cannot gain in quality as quickly as other approaches (for example transform coding and vector quantization) when increasing the ACELP codebook size." *See, e.g.*, *id.* "At lower bit rates (for example bit rates lower than 12 kbits/s), the ACELP model captures quickly the essential components of the excitation. But at higher bit rates, higher granularity and, in particular, a better control over how the additional bits are spent across the different frequency components of the signal are useful." *See, e.g.*, *id.*, 2:5-10.

109.    The '475 patent discloses particular solutions to solve this and other technical problems by "modify[ing] the CELP model such that another additional codebook stage is used to form the excitation." *See, e.g.*, *id.*, 5:60-67. The additional codebook stage is "referred to as a transform-domain codebook stage as it encodes transform-domain coefficients." *See, e.g.*, *id.*

---

[7] Cited excerpts of the '073 file history are attached as Exhibit 16.

The patent further describes multiple embodiments with the additional codebook. *See, e.g.*, *id.*, 2:33-62, 13:4-14. In the one embodiment (or structure), the "modified CELP model us[es] a transform-domain codebook stage followed by an innovative codebook stage[.]" *See, e.g.*, *id.*, 10:15-19. "Contrary to the first structure of modified CELP model where the transform-domain codebook stage can be seen as a pre-quantizer for the innovative codebook stage, the transform-domain codebook stage in the second codebook arrangement of the second structure of modified CELP model is used as a stand-alone third-stage quantizer (or a second-stage quantizer if the innovative codebook stage is not used)." *See, e.g.*, *id.*, 10:31-37. In one exemplary embodiment, "[a] selector may be provided to select an order of the time-domain CELP codebook and the transform-domain codebook in First and Second Codebook Stages, respectively, as a function of characteristics of the input sound signal." *Id.* at Abstract; *see also* 2:57-62.

110. The '475 patent further explains that "[a]lthough the transform-domain codebook stage puts usually more weights in coding the perceptually more important lower frequencies, contrary to the transform-domain codebook stage in the first codebook arrangement to whiten the excitation residual after subtraction of the adaptive and innovative codebook excitation contributions in all the frequency range. This can be desirable in coding the noise-like (inactive) segments of the input sound signal." *See, e.g.*, *id.*, 10:37-44.

111. According to the USPTO examiner, the claims of the '475 patent issued because, among other reasons, "[t]he prior art taken alone or in combination fail[ed] to teach 'a selector of an order of the CELP innovative codebook stage and the transform-domain codebook stage as a function of at least one of (a) characteristics of the input sound signal and (b) a bit rate of a codec using the CELP codebook coding device, wherein the selector comprises switches having a first position where the CELP innovative codebook stage is first and followed by the transform-domain codebook stage and a second position where the transform-domain codebook stage is first and followed by the CELP innovative codebook stage, and wherein: in the first position of the switches, the second calculator determines the second target signal using the first target signal and information from the CELP adaptive codebook stage and the third calculator

determines the third target signal using the second target signal and information from the CELP innovative codebook stage; and in the second position of the switches, the third calculator determines the third target signal using the first target signal and information from the CELP adaptive codebook stake and the second calculator determines the second target signal using the first target signal and information from the CELP adaptive codebook stage and the transform domain codebook stage, wherein each of the first calculator, the CELP adaptive codebook stage, the CELP innovative codebook stage, the transform-domain codebook stage, the second calculator, the third calculator, and the selector is configured to be processed by one or more processors, wherein the one or more processors is coupled to a memory.'" '475 File History, Notice of Allowance, June 4, 2014, at 2-3.[8]

## V.    The '741 Patent

112.    The '741 patent, entitled "Methods, encoder and decoder for linear predictive encoding and decoding of sound signals upon transition between frames having different sampling rates," was duly and legally issued on December 26, 2017, from a patent application filed April 2, 2015, with Redwan Salami and Vaclav Eksler as named inventors. The '741 patent claims priority to U.S. Provisional Application No. 61/980,865, filed on April 17, 2014.

113.    The inventions disclosed in the '741 patent relate to "efficient interpolation of LP parameters between two frames at different internal sampling rates." *See, e.g.*, '741 patent, 7:41-43. Said another way, the inventions relate to methods and an encoder and a decoder "for transition between frames with different internal sampling rates." *See*, *id.*, Abstract.

114.    As the '741 patent explains, "[d]ifferent internal sampling rates may be used at different bit rates to improve quality in multi-rate LP-based coding." *See, e.g.*, *id.*, 7:27-29. "In multi-rate coders the codec should be able to switch between different bit rates on a frame basis without introducing switching artefacts. In AMR-WB this is easily achieved since all the bit rates use CELP at 12.8 kHz internal sampling. However, in a recent coder using 12.8 kHz sampling at

---

[8] Cited excerpts of the '475 file history are attached as Exhibit 17.

bit rates below 16 kbit/s and 16 kHz sampling at bit rates higher than 16 kbits/s, the issues related to switching the bit rate between frames using different sampling rates need to be addressed." *See, e.g.*, *id.*, 2:47-55; 7:35-40.

115.     One approach to solving the technical problem "involves re-sampling the past synthesis signal from rate S**1** to rate S**2**, and performing complete LP analysis, this operation being repeated at the decoder, which is usually computationally demanding." *See, e.g.*, *id.*, 7:48-64.

116.     The '741 patent, however, takes a different approach—"without the need to re-sample the past synthesis and perform complete LP analysis." *See, e.g.*, *id.*, 7:65-8:8. It discloses particular solutions to solving this technical problem with improved conversion of LP synthesis filter parameters between different sampling rates. For example, the '741 patent claims a method and device for computing the power spectrum of the LP synthesis filter at a first rate, modifying the power spectrum to convert it from a first rate to a second rate, converting the modified power spectrum back to the time domain to obtain the filter autocorrelation at the second rate, and finally using the autocorrelation to compute LP filter parameters at the second rate. *See, e.g.*, *id.*

117.     According to the USPTO examiner, the claims of the '741 patent issued because, among other reasons, "the prior art fails to teach or suggest, either alone or in combination, for having 'a method for encoding a sound signal, comprising, producing, in response to the sound signal, parameters for encoding the sound signal during successive sound signal processing frames, wherein the sound signal encoding parameters include linear predictive (LP) filter parameters, wherein producing the LP filter parameters comprises, when switching from a first one of the frames using an internal sampling rate S1 to a second one of the frames using an internal sampling rate S2, converting the LP filter parameters from the first frame from the internal sampling rate S1 to a  the internal sampling rate S2, the and wherein converting the LP filter parameters from the first frame, and wherein herein modifying the power spectrum of the LP synthesis filter to convert it from the internal sampling rate SI to the internal sampling rate S2 comprises: if SI is less than S2, extending the power spectrum of the LP synthesis filter based on

a ratio between SI and S2; if SI is larger than S2, truncating the power spectrum of the LP synthesis filter based on the ratio between SI and S2.'" '741 File History, Notice of Allowance, September 5, 2017, at 9-10.[9]

## VI.    The '038 Patent

118.    The '038 patent, entitled "Coding generic audio signals at low bitrates and low delay," was duly and legally issued on April 21, 2015, from a patent application filed October 25, 2011, with Tommy Vaillancourt and Milan Jelinek as named inventors. The '038 patent claims priority to U.S. Provisional Application No. 61/406,379, filed on October 25, 2010.

119.    The inventions disclosed in the '038 patent relate to "mixed time-domain/frequency-domain coding devices and methods for coding an input sound signal[.]" '038 at patent, 1:13-15.

120.    As the '038 patent explains, "[a] state-of-the-art conversational codec can represent with a very good quality a clean speech signal with a bit rate of around 8 kbps and approach transparency at a bit rate of 16 kbps. However, at bitrates below 16 kbps, low processing delay conversational codecs, most often coding the input speech signal in time-domain, are not suitable for generic audio signals, like music and reverberant speech." *Id.*, 1:21-27.

121.    The '038 further explains that "[t]o overcome this drawback, switched codecs have been introduced, basically using the time-domain approach for coding speech-dominated input signals and a frequency-domain approach for coding generic audio signals. However, such switched solutions typically require longer processing delay, needed both for speech-music classification and for transform to the frequency domain." *Id.*, 1:27-34.

122.    The '038 patent discloses particular solutions to solve this and other technical problems using "a more unified time-domain and frequency-domain model." *Id.*, 1:35-36. For

---

[9] Cited excerpts of the '741 file history are attached as Exhibit 18.

example, the patent teaches a mixed time-domain/frequency-domain encoding apparatus for improving the encoding quality of input sound signals.

123.    According to the USPTO examiner, the claims of the '038 patent issued because, among other reasons, the prior art "fail[ed] to specifically disclose a calculator of a cut-off frequency for the time-domain excitation contribution in response to the input sound signal; a filter responsive to the cut-off frequency for adjusting a frequency extent of the time-domain excitation contribution; and wherein the calculator of time-domain excitation contribution processes the input sound signal in successive frames of said input sound signal and comprises a calculator of a number of sub-frames to be used in a current frame of the input sound signal, wherein the calculator of time-domain excitation contribution uses in the current frame the number of sub-frames determined by the sub-frame number calculator for said current frame." '038 File History, Non-Final Rejection, November 20, 2014, at 5-6.[10]

## ONEPLUS'S DIRECT INFRINGEMENT

124.    OnePlus has directly infringed, and continues to directly infringe, the VoiceAge Patents by, for example, making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services that practice one or more claims of each of the VoiceAge Patents, including, without limitation, OnePlus's mobile devices and other devices with EVS codec capabilities compliant with the EVS Standard. These Defendant devices include, but are not limited to, the OnePlus 9 and OnePlus 13, equivalents thereto, and the devices listed in Appendix A (OnePlus's "EVS Products").

125.    The EVS codec is a speech audio coding standard defined by the EVS Standard.

126.    Each of OnePlus's EVS Products includes hardware and software that implements the EVS codec, which is defined by the EVS Standard. Hardware and/or software components comprising OnePlus's EVS Products are publicly identified as supporting the EVS codec and/or Enhanced HD Voice, Ultra HD Voice, or HD Voice+ services.[11]

---

[10] Cited excerpts of the '038 file history are attached as Exhibit 19.

[11] Global mobile Suppliers Association, Enhanced Voice Services (EVS): market Update (May

127.    The VoiceAge Patents are essential to the EVS Standard.

128.    Because OnePlus's EVS Products include hardware and/or software components supporting the EVS codec compliant with the EVS Standard, OnePlus necessarily infringes the VoiceAge Patents.

129.    On information and belief, OnePlus tests or directs or controls others to test OnePlus's EVS Products to ensure they include hardware and software compliant with the EVS Standard.

<div align="center">ONEPLUS'S WILLFUL INFRINGEMENT</div>

130.    OnePlus had actual knowledge of the VoiceAge Patents at least as of February 11, 2020 upon receipt of VoiceAge EVS's letter inviting OnePlus to learn more about the VoiceAge EVS patent portfolio and to license its patents essential to the EVS standard.

131.    OnePlus knows that each of OnePlus's EVS Products includes hardware and software that implements the EVS codec. OnePlus also knows that the EVS codec is a speech audio coding standard defined by the EVS Standard.

132.    Accordingly, OnePlus had actual knowledge of its infringement of the VoiceAge Patents, or was willfully blind to that infringement, shortly after receiving the February 11, 2020 letter from VoiceAge EVS.

133.    Since February 11, 2020, or shortly thereafter, OnePlus's infringement of the VoiceAge Patents has been deliberate, intentional, willful, wanton, malicious, bad-faith, consciously wrongful, flagrant, and characteristic of a pirate.

134.    In 2021 and 2022, VoiceAge EVS and its affiliate filed actions against OnePlus affiliates OPPO and Realme in Germany in the district court of Munich asserting German counterparts to the '710, '843, '073, and '741 patents.

---

2019) attached as Exhibit 20.

135.    After filing of Complaints in Germany against OnePlus corporate affiliates, OnePlus continued to make, use, sell, offer for sale, and/or import the accused products into the United States.

136.    In 2023 and 2024, the Munich district court found that OnePlus affiliates OPPO and Realme infringed the European patent counterparts to the '710, '843, and '073 patents.

137.    The Munich district court has further found that OnePlus affiliates OPPO and Realme had not sufficiently shown a probability of success of invalidating the asserted European counterparts of the '710, '843, and '073 patents in co-pending German nullity actions. The German chambers further found that VoiceAge EVS's licensing activities did not amount to an abuse of a market dominant position and that OnePlus affiliates OPPO and Realme were not willing licensees. As a result, the German chambers dismissed the FRAND-defense raised by OnePlus affiliates OPPO and Realme. On March 20, 2025 the Munich court of appeals affirmed a judgment against the OnePlus affiliate OPPO, confirming the Munich district court's finding that OPPO was an unwilling licensee.

138.    Based on these findings, the district court of Munich granted VoiceAge EVS's requests for permanent injunctions in Germany and orders of destruction against OPPO and Realme.

139.    Since April 2025, a permanent injunction against OnePlus's corporate affiliate Realme's sale of devices implementing the EVS codec and an order for destruction of devices has been preliminarily enforced in Germany pending appeal. The permanent injunction includes the sale of OnePlus devices sold by a common distributor of Realme and OnePlus devices.

140.    Separately, the appellate German Federal Court of Justice has affirmed the validity of the European counterparts to the '710, '073, and '741 patents. The German Federal Patent Court has further entered judgment affirming the validity of the European counterpart to the '843 '038, and '475 patents. And courts in Brazil have further found that certain accused EVS-compliant handsets infringed the claims of the Brazilian counterpart to the '710 patent.

141.     On information and belief, OnePlus has knowledge of these proceedings. Despite the infringement and validity findings of the German courts, and despite findings that OnePlus affiliates OPPO and Realme were not willing licensees, OnePlus continued to make, use, sell, offer for sale, and/or import the accused products into the United States.

142.     Since first contacting OnePlus, VoiceAge EVS has entered into NDAs, conducted multiple rounds of negotiations, and concluded patent licenses with eleven other sophisticated handset manufacturers that, like OnePlus, manufacture and sell devices with EVS codec capabilities compliant with the EVS Standard that are capable of making a voice call using the EVS codec. In fact, VoiceAge EVS has now successfully licensed the vast majority of the United States handset market. VoiceAge EVS remains willing to license OnePlus, but OnePlus remains unwilling to take a license.

## ONEPLUS'S INDIRECT INFRINGEMENT

143.     VoiceAge EVS incorporates by reference the foregoing paragraphs including the factual allegations within the section titled "Notice and Compliance with FRAND Obligations."

144.     OnePlus has indirectly infringed, and continues to indirectly infringe, the VoiceAge Patents by inducing third parties to directly infringe those patents.

145.     OnePlus has induced, and continues to induce, direct infringement of the VoiceAge Patents by customers, importers, sellers, resellers, corporate affiliates, and/or end users of OnePlus's EVS Products.

146.     At least as early as February 3, 2020 or shortly thereafter, OnePlus has had actual knowledge or has been willfully blind to the existence of the VoiceAge Patents, OnePlus's infringement of the VoiceAge Patents, and the infringement of the VoiceAge Patents by OnePlus's customers.

147.     At least by way of review of VoiceAge EVS's website referenced in the February 3, 2020 letter, OnePlus knew or should have known of the VoiceAge Patents, knew or should have known that there was a high probability that the VoiceAge Patents were declared essential to the EVS Standard, and knew or should have known that an independent consortium, IPEC,

had reviewed and found that all of the asserted VoiceAge Patents were essential to the EVS Standard.

148.    Further, at least by way of the IPEC Declarations of Essentiality available on the VoiceAge EVS website, OnePlus, as a sophisticated technology company, knew or should have known that IPEC had found that at least two claims of each asserted VoiceAge Patent were essential to the EVS Standard, knew or deliberately took actions to avoid learning how the VoiceAge Patents were essential to the EVS Standard in view of specific sections of the EVS Standard identified in the IPEC Declarations for each of the evaluated claims, and knew or deliberately took actions to avoid learning that its EVS Products infringed the asserted VoiceAge Patents in view of IPEC's identification of "3GPP Terminal Products" (*i.e.*, mobile devices) as relevant to each of the evaluated claims.

149.    During the subsequent months, OnePlus took deliberate actions to avoid learning further about its infringement from VoiceAge EVS by refusing to respond or engage in discussions with VoiceAge EVS for over a year.

150.    OnePlus's knowledge of the VoiceAge Patents is further evidenced by the pending and final foreign actions between affiliates of OnePlus and VoiceAge EVS.

151.    Alternatively, at the very latest, OnePlus has had actual knowledge of the VoiceAge Patents and has had actual knowledge of or has been willfully blind to its infringement of the VoiceAge Patents and the infringement of the VoiceAge Patents by its customers as of the filing of the original Complaint.

152.    Accordingly, before filing of this Complaint, OnePlus knew that OnePlus's EVS Products, and similar devices, practiced the EVS Standard. OnePlus further knew, from the communication from VoiceAge EVS recited above, its participation in the mobile device industry, and public sources, that the VoiceAge Patents are essential to practicing the EVS Standard. OnePlus further knew that carriers in the United States, such as T-Mobile and Verizon, support the EVS codec. Despite this knowledge, OnePlus encouraged and continues to encourage

its customers to use the EVS Products on carrier networks and thereby infringe the VoiceAge Patents when EVS functionality is enabled.

153.    More specifically, before filing of this Complaint, OnePlus knew or was willfully blind to the fact that the use of OnePlus's EVS Products, and other OnePlus devices with EVS codec capabilities compliant with the EVS Standard, to make a voice call using the EVS codec, constitutes infringement of the VoiceAge Patents.

154.    OnePlus advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provides instructions on and/or encourages infringing use.

155.    OnePlus encourages and facilitates its customers to infringe the VoiceAge Patents by instructing customers that purchase OnePlus's EVS Products that such devices have voice calling capability and providing various indicators within those devices of the same.

156.    For instance, OnePlus provides its customers and sellers with user guides or repair manuals for each of the accused EVS Products.[12] The user guide includes instructions on how to make a phone call.[13] Using an accused device to make a phone call on an EVS-supported wireless carrier network results in infringement of the VoiceAge Patents. The repair guides instruct users to make a call test.[14]

---

[12] *See, e.g.*, https://www.oneplus.com/global/support/manuals (last accessed Apr. 29, 2025); *OnePlus 9 User Manual*, https://oneplussupport.s3.amazonaws.com/9+UM/OnePlus+9+User+Manual_EN.pdf (last accessed Apr. 29, 2025); attached as Exhibit 21; *OnePlus 13 Repair Manual*, https://service.oneplus.com/ee/user-manual#/viewer?fileId=1885321777428480006 (last accessed Apr. 29, 2025); attached as Exhibit 31.

[13] *See* Dialing, *OnePlus 9 User Manual*, https://oneplussupport.s3.amazonaws.com/9+UM/OnePlus+9+User+Manual_EN.pdf (last accessed Apr. 29, 2025), at 62; attached as Exhibit 21.

[14] *See* Call test, *OnePlus 13 Repair Manual*, https://service.oneplus.com/ee/user-manual#/viewer?fileId=1885321777428480006 (last accessed Apr. 29, 2025), at 55; attached as

157.    End users of OnePlus's EVS Products, pursuant to OnePlus's instructions, indicators, and advertisements, thus each directly infringe the VoiceAge Patents.

158.    OnePlus continues to encourage and facilitate the direct infringement of the VoiceAge Patents by end users of OnePlus's EVS Products.

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 7,693,710

159.    VoiceAge EVS incorporates by reference the foregoing paragraphs.

160.    Pursuant to 35 U.S.C. § 282, the '710 patent is presumed valid.

161.    Upon information and belief, OnePlus has infringed, and is currently infringing, the '710 patent in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services, including OnePlus's EVS Products, that practice one or more claims of the '710 patent.

162.    OnePlus infringes at least claims 16 and 24 of the '710 patent because OnePlus's EVS Products include hardware and/or software implementing the EVS codec compliant with the EVS Standard and are therefore capable of performing concealment of frame erasure as claimed by the '710 patent and as described at least in 3GPP standards document TS 26.445 §§ 4.1, 4.4, and 5.5.

163.    For example, as recited in claim 16, the OnePlus 9 and the OnePlus 13 are both a device for conducting concealment of frame erasure caused by frames of an encoded sound signal erased during transmission from an encoder to a decoder, comprising: in the encoder, a determiner of concealment/recovery parameters selected from the group consisting of a signal classification parameter, an energy information parameter and a phase information parameter related to the sound signal; and a communication link for transmitting to the decoder concealment/recovery parameters determined in the encoder; wherein: the decoder conducts frame erasure concealment and decoder recovery in response to the concealment/recovery parameters received from the encoder; the sound signal is a speech signal; the determiner of

---

Exhibit 31.

concealment/recovery parameters comprises a classifier of successive frames of the encoded sound signal as unvoiced, unvoiced transition, voiced transition, voiced, or onset; and the determiner of concealment/recovery parameters comprises a computer of the energy information parameter in relation to a maximum of a signal energy for frames classified as voiced or onset, and in relation to an average energy per sample for other frames. *See, e.g.*, TS 26.445 V14.2.0 §§ 4.1, 4.4, and 5.5.

164. As recited in claim 24, the OnePlus 9 and OnePlus 13 are also both a device for conducting concealment of frame erasure caused by frames of an encoded sound signal erased during transmission from an encoder to a decoder, comprising: in the encoder, a determiner of concealment/recovery parameters selected from the group consisting of a signal classification parameter, an energy information parameter and a phase information parameter related to the sound signal; and a communication link for transmitting to the decoder concealment/recovery parameters determined in the encoder; wherein: the sound signal is a speech signal; the determiner of concealment/recovery parameters comprises a classifier of successive frames of the encoded sound signal as unvoiced, unvoiced transition, voiced transition, voiced, or onset; and the determiner of concealment/recovery parameters comprises a computer of the energy information parameter in relation to a maximum of a signal energy for frames classified as voiced or onset, and in relation to an average energy per sample for other frames. *See, e.g.*, TS 26.445 V14.2.0 §§ 4.1, 4.4, and 5.5.

165. Attached as Exhibit 32 is an exemplary claim chart illustrating how OnePlus's EVS Products satisfy claims 16 and 24 of the '710 patent.

166. As was explained above, OnePlus has had actual knowledge of, or was willfully blind to, the existence of the '710 patent and OnePlus's infringement of the '710 patent before the filing of this Complaint.

167. Despite this knowledge, OnePlus continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this

risk was either known, or so obvious that it should have been known, to OnePlus. Thus, OnePlus's infringement has been, and continues to be, willful and deliberate.

168.    OnePlus induces third parties, including consumers, to infringe the '710 patent in violation of 35 U.S.C. § 271(b) by facilitating and encouraging them to perform actions that OnePlus knows to be acts of infringement of the '710 patent, including at least claims 16 and 24. Upon information and belief, OnePlus knows that the use of its mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, including OnePlus's EVS Products, constitutes infringement of the '710 patent. OnePlus advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provides instructions on and/or encourages infringing use.

169.    For instance, OnePlus encourages and facilitates its customers to infringe the '710 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices have voice calling capability, and providing various indicators within those devices of the same. OnePlus also encourages and facilitates its customers to infringe the '710 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices are compatible/operable on wireless carrier networks that support the EVS Standard. OnePlus's customers, pursuant to OnePlus's instructions and advertisements, each directly infringe the '710 patent, including at least claims 16 and 24.

170.    OnePlus's infringement has caused, and continues to cause, damage to VoiceAge EVS, and VoiceAge EVS is entitled to recover damages sustained as a result of OnePlus's wrongful acts in an amount subject to proof at trial.

### COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,401,843

171.    VoiceAge EVS incorporates by reference the foregoing paragraphs.

172.    Pursuant to 35 U.S.C. § 282, the '843 patent is presumed valid.

173.    Upon information and belief, OnePlus has infringed, and is currently infringing, the '843 patent in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services, including OnePlus's EVS Products, that practice one or more claims of the '843 patent.

174.    OnePlus infringes at least claims 11 and 14 of the '843 patent because OnePlus's EVS Products include hardware and/or software implementing the EVS codec compliant with the EVS Standard and are therefore capable of generating a transition mode excitation replacing an adaptive codebook excitation in a transition frame and/or at least one frame following the transition in a sound signal as claimed by the '843 patent and as described at least in 3GPP standards document TS 26.445 V14.2.0 §§ 4.1, 4.4, 5.1, and 5.2.

175.    For example, as recited in claim 11, the OnePlus 9 and OnePlus 13 are both a device for generating a transition mode excitation replacing an adaptive codebook excitation in a transition frame and/or at least one frame following the transition in a sound signal, comprising: a generator of a codebook search target signal; a transition mode codebook for generating a set of codevectors independent from past excitation, wherein the codevectors of said set each corresponds to a respective transition mode excitation and wherein the transition mode codebook comprises a codebook of glottal impulse shapes; a searcher of the transition mode codebook for finding the codevector of said set corresponding to the transition mode excitation optimally corresponding to the codebook search target signal. *See, e.g.*, TS 26.445 V14.2.0 §§ 4.1, 4.4, 5.1, and 5.2.

176.    As recited in claim 14, the OnePlus 9 and OnePlus 13 are also both a device as defined in claim 11, wherein the sound signal comprises a speech signal and wherein the transition frame is selected from the group consisting of a frame comprising a voiced onset and a frame comprising a transition between two different voiced sounds. *See, e.g.*, TS 26.445 §§ 4.4 and 5.1.

177.    Attached as Exhibit 33 is an exemplary claim chart illustrating how OnePlus's EVS Products satisfy claims 11 and 14 of the '843 patent.

178.    As was explained above, OnePlus has had actual knowledge of, or was willfully blind to, the existence of the '843 patent and OnePlus's infringement of the '843 patent before the filing of this Complaint.

179.    Despite this knowledge, OnePlus continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known, or so obvious that it should have been known, to OnePlus. Thus, OnePlus's infringement has been, and continues to be, willful and deliberate.

180.    OnePlus induces third parties, including consumers, to infringe the '843 patent in violation of 35 U.S.C. § 271(b) by facilitating and encouraging them to perform actions that OnePlus knows to be acts of infringement of the '843 patent, including at least claims 11 and 14. Upon information and belief, OnePlus knows that the use of its mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, including OnePlus's EVS Products, constitutes infringement of the '843 patent. OnePlus advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provides instructions on and/or encourages infringing use.

181.    For instance, OnePlus encourages and facilitates its customers to infringe the '843 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices have voice calling capability, and providing various indicators within those devices of the same. OnePlus also encourages and facilitates its customers to infringe the '843 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices are compatible/operable on wireless carrier networks that support the EVS Standard. OnePlus's customers, pursuant to OnePlus's instructions and advertisements, each directly infringe the '843 patent, including at least claims 11 and 14.

182.    OnePlus's infringement has caused, and continues to cause, damage to VoiceAge EVS, and VoiceAge EVS is entitled to recover damages sustained as a result of OnePlus's wrongful acts in an amount subject to proof at trial.

### COUNT III: INFRINGEMENT OF U.S. PATENT NO. 8,990,073

183.    VoiceAge EVS incorporates by reference the foregoing paragraphs.

184.    Pursuant to 35 U.S.C. § 282, the '073 patent is presumed valid.

185.    Upon information and belief, OnePlus has infringed, and is currently infringing, the '073 patent in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services, including OnePlus's EVS Products, that practice one or more claims of the '073 patent.

186.    OnePlus infringes at least claims 31 and 36 of the '073 patent because OnePlus's EVS Products include hardware and/or software implementing the EVS codec compliant with the EVS Standard and are therefore capable of detecting sound activity in a sound signal, wherein the sound signal is classified as one of an inactive sound signal and an active sound signal according to the detected sound activity in the sound signal and estimating a tonal stability of a sound signal using a frequency spectrum of the sound signal as claimed by the '073 patent and as described at least in 3GPP standards document TS 26.445 § 5.1.

187.    For example, as recited in claim 31, the OnePlus 9 and OnePlus 13 are both a device for estimating a tonal stability tonal stability of a sound signal using a frequency spectrum of the sound signal, the device comprising: a calculator of a current residual spectrum of the sound signal by subtracting from the frequency spectrum of the sound signal a spectral floor defined by minima of the frequency spectrum; a detector of a plurality of peaks in the current residual spectrum as pieces of the current residual spectrum between pairs of successive minima of the current residual spectrum; a calculator of a correlation map between each detected peak of the current residual spectrum and a shape in a previous residual spectrum corresponding to the position of the detected peak; and a calculator identifying the tonal stability of the sound signal based on calculating a long-term correlation map, wherein the long-term correlation map is

calculated based on an update factor, the correlation map of a current frame, and an initial value of the long-term correlation map. *See, e.g.*, TS 26.445 V14.2.0 § 5.1.

188.    As recited in claim 36, the OnePlus 9 and OnePlus 13 are also both a device for detecting sound activity in a sound signal, wherein the sound signal is classified as one of an inactive sound signal and an active sound signal according to the detected sound activity in the sound signal, the device comprising: a tonal stability tonal stability estimator of the sound signal, used for distinguishing a music signal from a background noise signal; wherein the tonal stability tonal stability estimator comprises a device according to claim 31. *See, e.g.*, TS 26.445 V14.2.0 § 5.1.

189.    Attached as Exhibit 34 is an exemplary claim chart illustrating how OnePlus's EVS Products satisfy claims 31 and 36 of the '073 patent.

190.    As was explained above, OnePlus has had actual knowledge of, or was willfully blind to, the existence of the '073 patent and OnePlus's infringement of the '073 patent before the filing of this Complaint.

191.    Despite this knowledge, OnePlus continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known, or so obvious that it should have been known, to OnePlus. Thus, OnePlus's infringement has been, and continues to be, willful and deliberate.

192.    OnePlus induces third parties, including consumers, to infringe the '073 patent in violation of 35 U.S.C. § 271(b) by facilitating and encouraging them to perform actions that OnePlus knows to be acts of infringement of the '073 patent, including at least claims 31 and 36. Upon information and belief, OnePlus knows that the use of its mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, including OnePlus's EVS Products, constitutes infringement of the '073 patent. OnePlus advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and

offers support and/or technical assistance to its customers that provides instructions on and/or encourages infringing use.

193.    For instance, OnePlus encourages and facilitates its customers to infringe the '073 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices have voice calling capability, and providing various indicators within those devices of the same. OnePlus also encourages and facilitates its customers to infringe the '073 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices are compatible/operable on wireless carrier networks that support the EVS Standard. OnePlus's customers, pursuant to OnePlus's instructions and advertisements, each directly infringe the '073 patent, including at least claims 31 and 36.

194.    OnePlus's infringement has caused, and continues to cause, damage to VoiceAge EVS, and VoiceAge EVS is entitled to recover damages sustained as a result of OnePlus's wrongful acts in an amount subject to proof at trial.

### COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 8,825,475

195.    VoiceAge EVS incorporates by reference the foregoing paragraphs.

196.    Pursuant to 35 U.S.C. § 282, the '475 patent is presumed valid.

197.    Upon information and belief, OnePlus has infringed, and is currently infringing, the '475 patent in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services, including OnePlus's EVS Products, that practice one or more claims of the '475 patent.

198.    OnePlus infringes at least claims 1 and 3 of the '475 patent because OnePlus's EVS Products include hardware and/or software implementing the EVS codec compliant with the EVS Standard and are therefore capable of performing encoding/decoding according to a CELP codebook as claimed by the '475 patent and as described at least in 3GPP standards document TS 26.445 §§ 4.4, 5.1 and 5.2.

199.    For example, as recited in claim 1, the OnePlus 9 and OnePlus 13 are both a CELP codebook coding device for encoding sound into first, second, and third sets of encoding

parameters, comprising: a first calculator of a first target signal for an adaptive codebook search in response to an input sound signal; a CELP adaptive codebook stage structured to search, in response to the first target signal, an adaptive codebook to find an adaptive codebook index and an adaptive codebook gain, the adaptive codebook index and gain forming the first set of encoding parameters; a CELP innovative codebook stage structured to search, in response to a second target signal, a CELP innovative codebook to find an innovative codebook index and an innovative codebook gain, the innovative codebook index and gain forming the second set of encoding parameters; a transform-domain codebook stage structured to calculate, in response to a third target signal, transform-domain coefficients and a transform-domain codebook gain, the transform-domain coefficients and the transform-domain codebook gain forming the third set of encoding parameters; a second calculator of the second target signal and a third calculator of the third target signal; a selector of an order of the CELP innovative codebook stage and the transform-domain codebook stage as a function of at least one of (a) characteristics of the input sound signal and (b) a bit rate of a codec using the CELP codebook coding device, wherein the selector comprises switches having a first position where the CELP innovative codebook stage is first and followed by the transform-domain codebook stage and a second position where the transform-domain codebook stage is first and followed by the CELP innovative codebook stage, and wherein: in the first position of the switches, the second calculator determines the second target signal using the first target signal and information from the CELP adaptive codebook stage and the third calculator determines the third target signal using the second target signal and information from the CELP innovative codebook stage; and in the second position of the switches, the third calculator determines the third target signal using the first target signal and information from the CELP adaptive codebook stage and the second calculator determines the second target signal using the first target signal and information from the CELP adaptive codebook stage and the transform-domain codebook stage, wherein each of the first calculator, the CELP adaptive codebook stage, the CELP innovative codebook stage, the transform-domain codebook stage, the second calculator, the third calculator, and the selector is configured to be

processed by one or more processors, wherein the one or more processors is coupled to a memory. *See, e.g.*, TS 26.445 V14.2.0 §§ 4.4 and 5.2.

200.    As recited in claim 3, the OnePlus 9 and OnePlus 13 are also both a device as defined in claim 1, wherein the selector comprises a classifier of the input sound signal, and the switches are controlled by the classifier to change the order of the CELP innovative codebook stage and the transform-domain codebook stage. *See, e.g.*, TS 26.445 V14.2.0 §§ 5.1 and 5.2.

201.    Attached as Exhibit 35 is an exemplary claim chart illustrating how OnePlus's EVS Products satisfy claims 1 and 3 of the '475 patent.

202.    As was explained above, OnePlus has had actual knowledge of, or was willfully blind to, the existence of the '475 patent and OnePlus's infringement of the '475 patent before the filing of this Complaint.

203.    Despite this knowledge, OnePlus continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known, or so obvious that it should have been known, to OnePlus. Thus, OnePlus's infringement has been, and continues to be, willful and deliberate.

204.    OnePlus induces third parties, including consumers, to infringe the '475 patent in violation of 35 U.S.C. § 271(b) by facilitating and encouraging them to perform actions that OnePlus knows to be acts of infringement of the '475 patent, including at least claims 1 and 3. Upon information and belief, OnePlus knows that the use of its mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, including OnePlus's EVS Products, constitutes infringement of the '475 patent. OnePlus advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provides instructions on and/or encourages infringing use.

205.    For instance, OnePlus encourages and facilitates its customers to infringe the '475 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices have voice calling capability, and providing various indicators within those devices of the same. OnePlus also encourages and facilitates its customers to infringe the '475 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices are compatible/operable on wireless carrier networks that support the EVS Standard. OnePlus's customers, pursuant to OnePlus's instructions and advertisements, each directly infringe the '475 patent, including at least claims 1 and 3.

206.    OnePlus's infringement has caused, and continues to cause, damage to VoiceAge EVS, and VoiceAge EVS is entitled to recover damages sustained as a result of OnePlus's wrongful acts in an amount subject to proof at trial.

### COUNT V: INFRINGEMENT OF U.S. PATENT NO. 9,852,741

207.    VoiceAge EVS incorporates by reference the foregoing paragraphs.

208.    Pursuant to 35 U.S.C. § 282, the '741 patent is presumed valid.

209.    Upon information and belief, OnePlus has infringed, and is currently infringing, the '741 patent in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services, including OnePlus's EVS Products, that practice one or more claims of the '741 patent.

210.    OnePlus infringes at least claims 17 and 20 of the '741 patent because OnePlus's EVS Products include hardware and/or software implementing the EVS codec compliant with the EVS Standard and are therefore capable of encoding sound signal as claimed by the '741 patent and as described at least in 3GPP standards document TS 26.445 §§ 4.1, 4.4, 5.2, 5.4 and 5.5.

211.    For example, as recited in claim 17, the OnePlus 9 and OnePlus 13 are both a device for encoding a sound signal, comprising: at least one processor; and a memory coupled to the processor and comprising non-transitory instructions that when executed cause the processor to: produce, in response to the sound signal, parameters for encoding the sound signal during

successive sound signal processing frames, wherein (a) the sound signal encoding parameters include linear predictive (LP) filter parameters, (b) for producing the LP filter parameters when switching from a first one of the frames using an internal sampling rate S$1$ to a second one of the frames using an internal sampling rate S$2$, the processor is configured to convert the LP filter parameters from the first frame from the internal sampling rate S$1$ to the internal sampling rate S$2$, and (c) for converting the LP filter parameters from the first frame, the processor is configured to: compute, at the internal sampling rate S$1$, a power spectrum of a LP synthesis filter using the LP filter parameters, modify the power spectrum of the LP synthesis filter to convert it from the internal sampling rate S$1$ to the internal sampling rate S$2$, inverse transform the modified power spectrum of the LP synthesis filter to determine autocorrelations of the LP synthesis filter at the internal sampling rate S$2$, use the autocorrelations to compute the LP filter parameters at the internal sampling rate S$2$, and encode the sound signal encoding parameters into a bitstream; and wherein the processor is configured to: extend the power spectrum of the LP synthesis filter based on a ratio between S$1$ and S$2$ if S$1$ is less than S$2$; and truncate the power spectrum of the LP synthesis filter based on the ratio between S$1$ and S$2$ if S$1$ is larger than S$2$. *See, e.g.*, TS 26.445 V14.2.0 §§ 4.1, 4.4, 5.2, 5.4 and 5.5.

212.    As recited in claim 20, the OnePlus 9 and OnePlus 13 are also both a device as recited in claim 17, wherein the processor is configured to compute the power spectrum of the LP synthesis filter as an energy of a frequency response of the LP synthesis filter. *See, e.g.*, TS 26.445 V14.2.0 § 5.5.

213.    Attached as Exhibit 36 is an exemplary claim chart illustrating how OnePlus's EVS Products satisfy claims 17 and 20 of the '741 patent.

214.    As was explained above, OnePlus has had actual knowledge of, or was willfully blind to, the existence of the '741 patent and OnePlus's infringement of the '741 patent before the filing of this Complaint.

215.    Despite this knowledge, OnePlus continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this

risk was either known, or so obvious that it should have been known, to OnePlus. Thus, OnePlus's infringement has been, and continues to be, willful and deliberate.

216.    OnePlus induces third parties, including consumers, to infringe the '741 patent in violation of 35 U.S.C. § 271(b) by facilitating and encouraging them to perform actions that OnePlus knows to be acts of infringement of the '741 patent, including at least claims 17 and 20. Upon information and belief, OnePlus knows that the use of its mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, including OnePlus's EVS Products, constitutes infringement of the '741 patent. OnePlus advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provides instructions on and/or encourages infringing use.

217.    For instance, OnePlus encourages and facilitates its customers to infringe the '741 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices have voice calling capability, and providing various indicators within those devices of the same. OnePlus also encourages and facilitates its customers to infringe the '741 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices are compatible/operable on wireless carrier networks that support the EVS Standard. OnePlus's customers, pursuant to OnePlus's instructions and advertisements, each directly infringe the '741 patent, including at least claims 17 and 20.

218.    OnePlus's infringement has caused, and continues to cause, damage to VoiceAge EVS, and VoiceAge EVS is entitled to recover damages sustained as a result of OnePlus's wrongful acts in an amount subject to proof at trial.

## COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 9,015,038

219.    VoiceAge EVS incorporates by reference the foregoing paragraphs.

220.    Pursuant to 35 U.S.C. § 282, the '038 patent is presumed valid.

221.     Upon information and belief, OnePlus has infringed, and is currently infringing, the '038 patent in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and/or importing into the United States without authority, products, equipment, software, and/or services, including OnePlus's EVS Products, that practice one or more claims of the '038 patent.

222.     OnePlus infringes at least claims 1 and 2 of the '038 patent because OnePlus's EVS Products include hardware and/or software implementing the EVS codec compliant with the EVS Standard and are therefore capable of encoding sound signal as claimed by the '038 patent and as described at least in 3GPP standards document TS 26.445 § 5.2.3.5.

223.     For example, as recited in claim 1, the OnePlus 9 and OnePlus 13 are both a mixed time-domain/frequency-domain coding device for coding an input sound signal, comprising: a calculator of a time-domain excitation contribution in response to the input sound signal; a calculator of a cut-off frequency for the time-domain excitation contribution in response to the input sound signal; a filter responsive to the cut-off frequency for adjusting a frequency extent of the time-domain excitation contribution; a calculator of a frequency-domain excitation contribution in response to the input sound signal; and an adder of the filtered time-domain excitation contribution and the frequency-domain excitation contribution to form a mixed time-domain/frequency-domain excitation constituting a coded version of the input sound signal. *See, e.g.*, TS 26.445 V14.2.0 § 5.2.3.5.

224.     As recited in claim 2, the OnePlus 9 and OnePlus 13 are also both a mixed time-domain/frequency-domain coding device according to claim 1, wherein the time-domain excitation contribution includes (a) only an adaptive codebook contribution, or (b) the adaptive codebook contribution and a fixed codebook contribution. *See, e.g.*, TS 26.445 V14.2.0 § 5.2.3.5.

225.     Attached as Exhibit 37 is an exemplary claim chart illustrating how OnePlus's EVS Products satisfy claims 1 and 2 of the '038 patent.

226.     As was explained above, OnePlus has had actual knowledge of, or was willfully blind to, the existence of the '038 patent and OnePlus's infringement of the '038 patent before the filing of this Complaint.

227.    Despite this knowledge, OnePlus continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known, or so obvious that it should have been known, to OnePlus. Thus, OnePlus's infringement has been, and continues to be, willful and deliberate.

228.    OnePlus induces third parties, including consumers, to infringe the '038 patent in violation of 35 U.S.C. § 271(b) by facilitating and encouraging them to perform actions that OnePlus knows to be acts of infringement of the '038 patent, including at least claims 1 and 2. Upon information and belief, OnePlus knows that the use of its mobile devices, and other devices with EVS codec capabilities compliant with the EVS Standard, including OnePlus's EVS Products, constitutes infringement of the '038 patent. OnePlus advertises the infringing products and services, publishes specifications and promotional literature encouraging customers to operate the accused products and services, creates and/or distributes user manuals for the accused products and services that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provides instructions on and/or encourages infringing use.

229.    For instance, OnePlus encourages and facilitates its customers to infringe the '038 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices have voice calling capability, and providing various indicators within those devices of the same. OnePlus also encourages and facilitates its customers to infringe the '038 patent by instructing customers that purchase the OnePlus 9 or OnePlus 13 that such devices are compatible/operable on wireless carrier networks that support the EVS Standard. OnePlus's customers, pursuant to OnePlus's instructions and advertisements, each directly infringe the '038 patent, including at least claims 1 and 2.

230.    OnePlus's infringement has caused, and continues to cause, damage to VoiceAge EVS, and VoiceAge EVS is entitled to recover damages sustained as a result of OnePlus's wrongful acts in an amount subject to proof at trial.

**JURY TRIAL DEMANDED**

VoiceAge EVS hereby demands a trial by jury on all claims and issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, VoiceAge EVS respectfully requests that the Court:

A.    Enter judgment that OnePlus has directly infringed one or more claims of one or more of the VoiceAge Patents, either literally or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a);

B.    Enter judgment that OnePlus has induced infringement of one or more claims of one or more of the VoiceAge Patents in violation of 35 U.S.C. § 271(b);

C.    Enter an order, pursuant to 35 U.S.C. § 284, awarding to VoiceAge EVS damages adequate to compensate for OnePlus's infringement of the VoiceAge Patents (and, if necessary, related accountings), in an amount to be determined at trial, but not less than a reasonable royalty, and enhancing any damages awarded pursuant to 35 U.S.C. § 284 as a result of OnePlus's willful infringement;

D.    Enter an order, pursuant to 35 U.S.C. § 285, deeming this to be an "exceptional case" and thereby awarding to VoiceAge EVS its reasonable attorneys' fees, costs, and expenses;

E.    Enter an order that OnePlus account for and pay to VoiceAge EVS the damages to which VoiceAge EVS is entitled as a consequence of the infringement;

F.    Enter an order for a post-judgment equitable accounting of damages for the period of infringement of the VoiceAge Patents following the period of damages established at trial;

G.    Enter an order awarding to VoiceAge EVS pre- and post-judgment interest at the maximum rates allowable under the law and its costs; and

H.    Enter an order awarding to VoiceAge EVS such other and further relief, whether at law or in equity, that this Court deems just and proper.

Dated: May 1, 2025

*Of Counsel:*

Andrea L. Fair
Texas State Bar No. 24078488
andrea@millerfairhenry.com
Garrett C. Parish
Texas State Bar No. 24125824
garrett@millerfairhenry.com
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
T: (903) 757-6400
F: (903) 757-2323

Respectfully submitted,

*/s/ Annie Huang by permission Andrea L. Fair*
David M. Stein
Texas State Bar No. 00797494
dstein@olsonstein.com
**OLSON STEIN LLP**
240 Nice Lane #301
Newport Beach, CA 92663
T: (949) 887-4600

Cyrus M. Morton
MN Bar No. 0287325 (admitted in this District)
Benjamen C. Linden (*pro hac vice* to be
submitted)
MN Bar No. 0393232
**Robins Kaplan LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
T: (612) 349-8500
F: (612) 339-4181
cmorton@robinskaplan.com
blinden@robinskaplan.com

Annie Huang
NY Bar No. 4971149 (admitted in this District)
Miles Finn (*pro hac vice* to be submitted)
NY Bar No. 5243316
**Robins Kaplan LLP**
900 Third Avenue, Suite 1900
New York, New York 10022
T: (212) 980-7400
F: (212) 980-7499
ahuang@robinskaplan.com
mfinn@robinskaplan.com

*Attorneys for Plaintiff VoiceAge EVS LLC*